## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### TAMPA DIVISION

**ARROW TRUCK SALES,**
**INCORPORATED,**

     **Plaintiff,**

**v.**                         **Case No.  8:14-cv-2052-T-30TGW**

**TOP QUALITY TRUCK & EQUIPMENT,**
**INC. and JOE GELFO,**

     **Defendants.**
_____/

## <u>ORDER</u>

Plaintiff Arrow Truck Sales, Incorporated brings this action against Defendants Top Quality Truck & Equipment, Inc. and Joe Gelfo seeking damages associated with a failed business transaction related to the sale of twelve semi-trucks from Top Quality to Arrow Truck for a total purchase price of $570,000.  On August 10, 2015, the Court conducted a non-jury trial.  Having carefully considered the testimony and evidence presented at trial, and for the reasons set forth below, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with its obligations under Rule 52 of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

1.    Plaintiff Arrow Truck Sales, Incorporated and Defendant Top Quality Truck & Equipment, Inc. are in the business of buying and selling used semi-trucks.

2.    From 2009-2014, Defendant Joe Gelfo sold trucks to Arrow on behalf of Top Quality.

3.    During January and February 2014, Gelfo negotiated with Nick Lombardo, Arrow Truck's assistant manager of the purchasing and wholesale department, the sale of twelve 2011 Mack CXU613 Trucks (the "Trucks") for an agreed total purchase price of $570,000 (the "Transaction").

4.    Gelfo and Lombardo were the only individuals from Top Quality and Arrow, respectively, involved in the Transaction.

5.    Gelfo and Lombardo exchanged numerous e-mail communications with respect to the Transaction.  Lombardo testified that it was not uncommon in the business to do an entire truck deal via e-mail.

6.    At all relevant times, Gelfo's personal and business e-mail account was joegelfo@gmail.com (the "Gelfo E-mail Account").

7.    At all relevant times, Lombardo's business e-mail account was nlombardo@arrowtruck.com (the "Lombardo E-mail Account").  Lombardo did not conduct personal communications on the Lombardo E-mail Account.

8.    On January 24, 2014, Gelfo sent an e-mail from the Gelfo E-mail Account to the Lombardo E-mail Account, confirming the Transaction and enclosing (1) an invoice

demonstrating the sale of the Trucks for $570,000; (2) copies of the fronts of the titles

for each of the Trucks; and (3) the back of one certificate of title for the Trucks.

9.    The invoice attached to the January 24, 2014 e-mail included "Wiring Instructions for

Top Quality Truck & Equipment, Inc."

10.   The Wiring Instructions included the following details:

Account Name: Top Quality Truck & Equipment, Inc.
Bank Name: BB&T
Branch Name: Brandon Florida Financial Center
Branch Phone #: (813) 654-8455
Routing Number: 263191387
Account Number: 0000146805833.

11.   The wiring instructions attached to the January 24, 2014 e-mail were identical to

wiring instructions Gelfo provided to Lombardo for past truck sales.  Specifically,

with respect to prior transactions between the parties, it was common practice that

Gelfo would e-mail the wiring instructions to Lombardo.  The wiring instructions

from previous transactions between the parties were the same instructions that were

included in the invoice for the Transaction (see ¶10 above).

12.   With respect to the enclosed title for the Trucks, Gelfo had signed the certificate of

title purportedly on behalf of Tri-State Truck Center, the seller.  No one had signed

yet on behalf of Top Quality.  Gelfo acknowledged that Top Quality did not own title

to the Trucks on January 24, 2014.  At that time, Tri-State owned the Trucks.  Gelfo

testified that it was typical in the industry to negotiate the sale of used semi-trucks to

a buyer prior to having actual title.  Gelfo testified that the customary practice was to

provide the owner of the Trucks, Tri-State, the funds *after* Gelfo received the funds

from the buyer, Arrow.  Gelfo, a former employee of Arrow, testified that his actions were consistent with industry practice and that Arrow was aware of this industry practice.  Gelfo testified that Top Quality sold Arrow approximately 115 trucks and that all of the trucks were sold in this same manner.  Gelfo testified that he informed Lombardo verbally that Top Quality did not own the Trucks as of January 24, 2014.  Lombardo had known Gelfo personally for many years.  Lombardo met Gelfo when Gelfo worked for Arrow.  Lombardo knew that Gelfo was associated with Top Quality and not Tri-State.

13.  John Kulb, Top Quality's owner, also testified that the wholesale trucking industry was a small community and it was industry practice to sell trucks to buyers prior to having title.  Common practice was to obtain the cash from the ultimate buyer before Top Quality supplied the cash to the seller.  With respect to the Transaction, Kulb testified that Gelfo's actions were in line with this industry practice.  Kulb testified that ninety percent of the trucks Top Quality sold to other buyers were transacted before Top Quality actually had title to the trucks - this was standard industry practice.  Upon receipt of the cash from the ultimate buyer, Top Quality would pay the party that it had contracted to purchase the trucks, obtain title to the trucks, and then overnight the titles to the ultimate buyer.

14.  Lombardo testified that Gelfo never informed him that Top Quality did not have title to the Trucks.  Lombardo testified that Arrow would have never purchased the Trucks from Top Quality if it had known that Tri-State still owned the Trucks.  Lombardo

testified that in his thirteen years as an employee of Arrow Truck, he has never purchased a truck from a third party vendor who was not the actual owner of the truck.

15. James Neu, Arrow's director of financial planning analysis, testified that Arrow will not purchase a truck from a party who is not the actual owner of the truck. Arrow requires the titles to be in the name of the selling party. Neu testified that he would not have permitted Arrow to make the total payment of $570,000 to Top Quality if he had known that Top Quality did not own the Trucks.

16. The Court accepts Gelfo and Kulb's testimony as the more credible testimony and makes a finding of fact that Gelfo's failure to provide legitimate title to Lombardo for the sale of the Trucks prior to Top Quality's receipt of the cash for the Transaction was consistent with industry practice and not fraudulent. The Court also makes a finding of fact that the certificate of title that Gelfo provided to Lombardo showing Top Quality as the owner of the Trucks was not fraudulent for these same reasons, i.e., it was consistent with ordinary business practice to provide the buyer with an example of what the title would ultimately look like after Top Quality obtained the funds from Arrow. Notably, Neu's testimony that it was Arrow's policy to "[m]ake sure titles are in the name of the person we are paying" lacks credibility because Arrow's payments related to the Transaction were made to Olushi LLC, not Top Quality. *See* Ex. 13 at ARROW 001014. Finally, the Court finds that Lombardo did

not rely on Gelfo's signature on the back of the title to complete the deal to purchase the Trucks.

17.   Gelfo testified that he maintained good security measures on the Gelfo E-mail Account.  He testified that he utilized a password to access the Gelfo E-mail account; once he accessed the account, he left his e-mail open on his computer.

18.   The evidence presented reflects that third-party fraudsters hacked into both the Gelfo E-mail Account and the Lombardo E-mail Account during the time that Gelfo and Lombardo were negotiating the sale of the Trucks.

19.   The third-party fraudsters also created new e-mail accounts that appeared nearly identical to the Gelfo and Lombardo e-mail accounts.  The fraudulent e-mail addresses were so similar to the Gelfo and Lombardo e-mail accounts that neither individual immediately discovered the fraud.

20.   The third-party fraudsters also sent e-mails from the legitimate Gelfo and Lombardo e-mail accounts.  It is unclear how they were able to do this.

21.   The first fraudulent e-mail was purportedly sent from Lombardo on January 24, 2014. This e-mail was sent from nlombardo.arrowtruck.com@gmail.com, a fraudulent e-mail address, to the Gelfo E-mail Account.

22.   On February 4, 2014, an e-mail was sent from the Gelfo E-mail Account containing "updated" wiring instructions.   The attached wiring instructions contained the following information:

Bank Name: Suntrust Bank
Address: 2171 Pleasant Hill Rd Duluth GA 30096
Beneficiary: OLUSHI LLC (for Top Quality $ Equipment)
Account #: 1000168538550
Routine [sic] #: 061000104.

23.   Unbeknownst to either party at the time, the updated wiring instructions attached to

the February 4, 2014 e-mail were fraudulent; the e-mail was sent by a third-party

fraudster.

24.   Lombardo testified that he did not question the updated wiring instructions despite the

fact that they included markedly different information from the previous wiring

instructions.  Lombardo did not focus on where the payment goes because it was not

his business.  For example, Lombardo testified that Arrow received its wires at its

bank in New York City regardless of which office made the sale.  Lombardo

acknowledged that Top Quality did not have any locations outside of Florida but

stated that it was not unusual to send wires to different locations.  But he admitted that

when Arrow used New York City to receive wires, the beneficiary was always

identified as Arrow, not a different company, as it was done with respect to the

fraudulent instructions.  Lombardo repeatedly stated that he did not pay attention to

wiring instructions because it did not matter to him where a company wants its money

sent.

25.   On February 11, 2014, another fraudulent e-mail was sent from Gelfo to Lombardo.

This e-mail was sent from a fraudulent e-mail address, joegeflo@gmail.com, and

stated that "due to some unsettled tax issues with out [sic] old bank account, we shall

receive wires with our Subsidiary bank account for current transactions.  I have attached the wiring instructions with this email . . ."  The attached wiring instructions contained the following information, in relevant part:

Bank Name: Suntrust Bank
Address: 2171 Pleasant Hill Rd Duluth GA 30096
Beneficiary: OLUSHI LLC
Account #: 1000168538550
Routine [sic] #: 061000104.

26.   The next day, on February 12, 2014, at 12:01 p.m., Gelfo sent an e-mail to Lombardo from the legitimate Gelfo E-mail Account, attaching the invoices for the Transaction. The invoices included the same wiring instructions that were on the original invoice as reflected in paragraph 10 above.  These were the correct instructions and, as previously stated, identical to past wiring instructions.

27.   Five hours later that same day on February 12, 2014, Arrow sent a wire in the amount of $429,000.  On February 13, 2014, Arrow sent a second wire in the amount of $141,000.  Both wires were sent to Suntrust Bank in Duluth GA, for beneficiary, Olushi LLC, consistent with the fraudulent wiring instructions.

28.   Subsequently, the parties learned of the fraud related to the Transaction.  As a result, Top Quality never received the $570,000 from Arrow and refused to deliver the Trucks to Arrow.  This litigation then followed.

29.   The Court makes a finding of fact that neither Gelfo nor Lombardo was negligent in the manner that they maintained their e-mail accounts.  They were both victims of a sophisticated third-party fraudster or fraudsters who hacked into both of their e-mail

accounts to perpetrate the fraud and divert the $570,000 to the fraudsters' bank account.

30.   The Court also finds that Lombardo had more opportunity and was in the better position to discover the fraudulent behavior based on the timing of the e-mails and the fact that the fraudulent wiring instructions involved a different beneficiary, different bank, different location, and different account information from all of the previous wiring instructions.  The Court finds that, at the very least, the change in the wiring instructions and conflicting e-mails should have prompted Lombardo to confirm the information with Gelfo prior to wiring any funds, especially after Gelfo sent the correct instructions again on February 12, 2014, before the wires went out later that day and the next day.

31.   On February 20, 2014, Top Quality entered into an agreement with TEC Equipment for TEC Equipment to purchase the Trucks for $570,000.  Gelfo sent TEC Equipment the same certificate of titles for the Trucks that he had sent to Arrow despite the fact that Top Quality did not have title to the Trucks at this time.  This fact supports the Court's finding that it was industry practice to negotiate the sale of the trucks and require payment from the buyer prior to obtaining title.  Additionally, this fact supports the Court's finding that Gelfo's actions with respect to the titles to the Trucks were not fraudulent.

32.   On February 24, 2014, TEC Equipment wired $570,000 to Top Quality.

33.   On February 26, 2014, Top Quality received title to the Trucks from Tri-State.

34.     Top Quality made an additional payment of $36,000 to Tri-State prior to receiving the title to the Trucks.  This payment related to work Tri-State performed on the Trucks to bring the Trucks to industry standard.  Top Quality admitted that this payment was completely voluntary and was provided to Tri-State to help their business relationship.

35.     The Court makes a finding of fact that Top Quality mitigated its damages related to Arrow's non-payment because it immediately sold the Trucks to TEC Equipment for the same contractual amount, $570,000.  As such, the Court finds that Top Quality's damages with respect to Arrow's breach of the contract (as discussed in more detail below) are zero.

## II. CONCLUSIONS OF LAW[1]

Arrow asserts three claims against Top Quality and Gelfo: breach of contract for failure to deliver the Trucks; fraud and misrepresentation based on false titles used to induce Arrow to pay for the Trucks; and negligence for Defendants' failure to use reasonable security measures to protect Defendants' business transactions conducted over the Gelfo E-mail Account.

Top Quality asserts a counterclaim against Arrow for breach of contract based on Arrow's failure to pay for the Trucks and seeks damages associated with the re-sale of the Trucks to TEC Equipment.

---

[1] The Court previously ruled that Gelfo was the actual agent for Top Quality at all relevant times (Dkt. 57).

The Court concludes that Arrow has not established its claims based on the evidence presented and the Court's findings of fact as set forth above.  Specifically, the Court concludes that Arrow, not Top Quality, breached the contract for the Trucks because, after the contract was executed, Arrow never provided payment for the Trucks to Top Quality. As such, Top Quality was not obligated to deliver the Trucks.

The Court also concludes that Arrow's fraud and misrepresentation claim fails because the Court made findings of fact that Gelfo's actions with respect to the titles for the Trucks were not fraudulent and were actually in line with industry practice that the title typically followed the sale.  Moreover, even assuming for the sake of argument that Gelfo's actions were fraudulent in some way, Arrow's argument that the loss would have been avoided, but for this fraud, is too tenuous.  For example, assuming Top Quality owned title to the Trucks at the relevant time, this fact would not have altered the third-party fraudsters' actions of hacking into the e-mail accounts and diverting the funds via a fraudulent wire. Simply put, it was the fraudulent wire that caused the loss, not Gelfo's actions with respect to the titles.

With respect to the negligence claim, Arrow argues that Top Quality and Gelfo created the circumstances that allowed the third-party fraudsters to interfere with and compromise the Gelfo E-mail Account and Top Quality and Gelfo were in a better position to avoid the loss.  This argument fails because the Court made a finding of fact that neither Gelfo nor Lombardo negligently handled their e-mail accounts.  The Court also made a

finding of fact that the fraudsters hacked into both e-mail accounts and there is no way to determine which account was first compromised or how it was accomplished.

Recognizing the peculiar facts of this case, the Court, prior to the bench trial, ordered the parties to provide the Court with case law discussing the issue of which party to a contract bore the loss stemming from fraud committed by an outsider, i.e., a third-party fraudster, that resulted in nonperformance of that contract. The parties informed the Court that they were unable to find a factually similar case. The Court then conducted its own research on the issue and also did not find a factually similar case. However, the Court identified cases in the banking context dealing with third party "imposters" and forged checks that are helpful to resolve this issue. Under the "imposter rule," the party who was in the best position to prevent the forgery by exercising reasonable care suffers the loss. *See, e.g.* UCC § 3-404(d); *State Sec. Check Cashing, Inc. v. Am. Gen. Fin. Servs.*, 972 A.2d 882 (Md. App. 2009).

Here, the Court made findings of fact that Lombardo was in the best position to prevent the fraud. As explained above, Lombardo received fraudulent wire instructions from the third-party fraudster. The instructions involved completely different information from all of the previous instructions. Rather than question this information, which differed from past instructions and identified a different bank, location, and even a different beneficiary, Lombardo testified that he did not care where the wires went and that it was not his business to question the information. Lombardo still did not question the wire instructions, even after receiving the correct instructions contained in the two invoices on February 12, 2014, *prior*

to the money being sent. In other words, the most recent wire information Gelfo provided to Lombardo was legitimate; but the wires were still sent based on the prior fraudulent instructions.

Simply put, Lombardo should have exercised reasonable care after receiving conflicting e-mails containing conflicting wire instructions by calling Gelfo to confirm or verify the correct wire instructions prior to sending the $570,000. As such, Arrow should suffer the loss associated with the fraud.

Finally, although the Court concludes that Arrow's non-payment breached the contract, the Court made a finding of fact that Top Quality immediately mitigated its damages. The Court also concludes that Top Quality's *voluntary* payment of $36,000 to Tri-State did not flow from any breach on Arrow's part. As such, Top Quality will be awarded zero damages associated with Arrow's breach.

It is therefore ORDERED AND ADJUDGED that:

1.    The Clerk of Court shall enter final judgment in favor of Defendants and against Plaintiff.

2.    The Clerk of Court shall close this case and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida on August 18, 2015.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>**Copies furnished to:**</u>
Counsel/Parties of Record